Electronically Filed 3/26/2026 8:30 AM
Stacey Kemp County Clerk
Collin County, Texas
By: Bennetta Hughes, Deputy
Envelope ID: 112885989

## CAUSE NO. 007-01455-2025

| | | |
|---|---|---|
| **VICKI MILNER,** *Plaintiff,* | § § § | **IN THE COUNTY COURT AT LAW** |
| *v.* | § § | |
| **NEXGEN CONTACT SOLUTIONS, LLC, NEXGEN TECHNOLOGIES, LLC, and JOSEPH JACOBONI** *Defendants.* | § § § § § | **NUMBER 7** |
| | | **OF COLLIN COUNTY, TEXAS** |

## PLAINTIFF'S RESPONSE TO DEFENDANTS NEXGEN TECHNOLOGIES, LLC AND JOSEPH JACOBONI'S SPECIAL APPEARANCE

Plaintiff Vicki Milner files this Response to Defendants NexGen Technologies, LLC ("NGT") and Joseph Jacoboni's Special Appearance, and respectfully shows the Court the following:

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 2

II. PROCEDURAL POSTURE ........................................................................................... 2

III. LEGAL STANDARD ..................................................................................................... 3

    A. Burdens of Proof ..................................................................................................... 4

    B. Jurisdiction Based on Fraudulent Transfers ........................................................... 4

        i. Activity outside of Texas can support personal jurisdiction. ........................... 5

        ii. Entities and individuals alike are subject to personal jurisdiction when they direct a fraudulent transfer with intent to harm a Texas resident. ........................... 6

IV. FACTUAL ANALYSIS ................................................................................................... 9

    A. Milner's Third Amended Petition establishes a prima facie case of personal jurisdiction over both NGT and Jacoboni. ........................................................................ 9

        i. Jacoboni personally created and acknowledged the debt and assured Milner it would be paid. ...................................................................................................... 9

ii.    Jacoboni personally directed transfers to NGT and to himself instead of paying Milner. ..................................................................................................................................10

iii.   Jacoboni and NGT intended to harm Milner...................................................... 11

B.    Defendants haven't negated the bases Milner asserts. ........................................12

V.  CONCLUSION..........................................................................................................13

## I.    INTRODUCTION

This started as a wage theft case. Defendants never paid Plaintiff Vicki Milner at all for the first seven months of her employment. This Court already denied the Special Appearance filed by Defendant Nexgen Contact Solutions, LLC ("NCS"), the entity that directly employed Milner, finding it has personal jurisdiction over NCS.

Following that order, NCS dissolved. Milner added claims against NCS's parent company NGT and CEO Joseph Jacoboni under the Texas Uniform Fraudulent Transfer Act (TUFTA). Milner alleges that Jacoboni, as CEO of both NCS and NGT, personally recruited Milner, acknowledged the unpaid salary at issue here, assured her NCS would pay, then intentionally directed the transfer of funds from NCS to NGT and himself to avoid paying Milner. This Court has personal jurisdiction over NGT and Jacoboni due to their alleged significant and intentional contacts with Texas and the fact that this litigation arises directly from those contacts.

## II.    PROCEDURAL POSTURE

On April 14, 2025, Milner filed her original petition against NCS, alleging breach of contract. On May 23, 2025, NCS filed a Special Appearance, objecting to personal jurisdiction. On July 9, 2025, Milner filed her Response and her First Amended Petition, supplementing the jurisdictional facts. On July 17, 2025, this Court denied NCS's Special Appearance, finding that

"its exercise of jurisdiction over Defendant comports with federal due process under both a general jurisdiction and a specific jurisdiction analysis."

On November 19, 2025, NGT filed Articles of Dissolution with the Florida Department of State, stating "there has been no business in the company, leading to no cash flow/revenue." Plaintiffs' Third Amended Petition, ¶ 32.

On December 10, 2025, Milner filed her Second Amended Petition, naming NGT and Jacoboni as defendants, alleging that NCS transferred funds to them and that they all intended to delay and hinder Milner from collecting her unpaid salary and to defraud her, in violation of the TUFTA.

On January 29, 2026, Defendants NGT and Jacoboni filed their Special Appearance, objecting to this Court's exercise of personal jurisdiction over them.

Concurrent with this Response, Plaintiff files her Third Amended Petition, supplementing the jurisdictional facts.

## III. LEGAL STANDARD

The "Texas long-arm statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009) (cleaned up). Therefore, this courts need "only analyze whether [a defendant]'s acts would bring [it] within Texas' jurisdiction consistent with constitutional due process requirements." *Id.* "Specific jurisdiction, which is alleged here, arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Id.* at 338.

## A.  Burdens of Proof

"When personal jurisdiction is challenged, the plaintiff and the nonresident defendant bear shifting burdens of proof." *PetroSaudi Oil Services Ltd. v. Hartley*, 617 S.W.3d 116, 135 (Tex. App.—Hous. [1st Dist.] 2020). "The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the scope of Texas's long-arm statute." *Id.* "The trial court may consider the plaintiff's original pleadings as well as his response to the defendant's special appearance in determining whether the plaintiff satisfied his initial burden." *Id.* The plaintiff may also "amend the pleading to include the necessary factual allegations." *Valero Refining Co. - Oklahoma v. Comeaux*, No. 14-20-00862-CV, 2022 WL 15505162, at *5 (Tex. App.—Hous. [14th Dist.] Oct. 27, 2022) (quoting *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010).

"If the plaintiff meets its initial pleading burden, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff." *PetroSaudi*, 617 S.W.3d at 135. "If the defendant negates the plaintiff's jurisdictional allegations, the plaintiff must respond with evidence that establishes 'the requisite link with Texas' and bears the ultimate burden to establish personal jurisdiction as a matter of law." *Id.*

## B.  Jurisdiction Based on Fraudulent Transfers

Milner's claims against Defendants NGT and Jacoboni are for fraudulent transfers under the TUFTA. Defendants cite cases regarding personal jurisdiction in other types of claims, the facts of which are far afield from the present case, but they offer no analysis in the context of TUFTA claims.[1] That matters because "we must consider the claims involved in the litigation to

---

[1] *See* Defs.' Spec. Appearance, 9 (citing *Atiq v. CoTechno Group, Inc.*, No. 03-13-00762-CV, 2015 WL 6871219, at *3 (Tex. App.—Austin Nov. 4, 2015, pet. denied) (involving claims of conversion); *Lang v. Capital Res. Invs. I & II, LLC,*

determine the operative facts." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 340 (Tex. 2009). Milner calls the Court's attention to the following authorities that are far more factually similar.

### i.    Activity outside of Texas can support personal jurisdiction.

First, Defendants argue that "Plaintiff's claims do not arise out of, or relate to, NGT's alleged Texas-focused activities" because "any alleged TUFTA violation would have taken place outside of the forum state." Spec. Appearance, 8. And Defendants repeatedly emphasize that they don't reside in or travel to Texas.

That doesn't matter. "[A]n act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999) (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). "Jurisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009) (quoting same). "[E]ven in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas." *Retamco*, 278 S.W.3d at 340. In *Retamco*, the Texas Supreme Court found personal jurisdiction over a California entity in a

---

102 S.W. 3d 861, 866 (Tex. App.—Dallas 2003) (breach of fiduciary duty, breach of duty of care and loyalty, and negligence); *Baker v. Bechtle*, No. 14-00-00671-CV, 2004 WL 502918 (Tex. App.—Houston [14th Dist.] Mar. 16, 2004, no pet.) (DTPA, negligent misrepresentation, and common law fraud); *Gustafson v. Provider Healthnet Servs.*, 118 S.W.3d 479, 483-84 (Tex. App.—Dallas 2003) (breach of confidentiality agreement, misappropriation of trade secrets and business information, and breach of fiduciary duty)).

TUFTA claim alleging a fraudulent transfer that took place in California "for the purpose of defrauding a Texas resident." *Id.* at 341.

Likewise, in *Mullins v. TestAmerica, Inc.*, the Fifth Circuit affirmed personal jurisdiction over New York defendants in a TUFTA suit brought by a Texas creditor, even though there was no allegation that those defendants had any offices, employees, or presence in Texas and every transfer at issue occurred entirely outside the state. 564 F.3d 386 (5th Cir. 2009). A federal court in the Northern District of Texas reached the same conclusion in *Sourcing Management, Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899 (N.D. Tex. 2015), finding personal jurisdiction over a California entity with "no office, place of business, employees, agents, or other presence in Texas" based on allegations it had participated in a scheme to transfer assets outside Texas for the purpose of defeating a Texas creditor's judgment.

### ii. Entities and individuals alike are subject to personal jurisdiction when they direct a fraudulent transfer with intent to harm a Texas resident.

*Mullins v. TestAmerica, Inc.* establishes two points directly applicable here. First, an entity that engineers and directs a fraudulent transfer—rather than merely receiving one—is subject to personal jurisdiction in the Texas creditor's forum. Second, the individual officer who personally carries out that scheme is likewise subject to jurisdiction, even when acting in a representative capacity.

Billy Mullins, a Texas resident, sold his Texas company METCO (later renamed Faraway Enterprises) to TestAmerica, a North Carolina corporation, in exchange for cash and a promissory note. 564 F.3d at 389-90. When TestAmerica later sold all of its assets for $33.5 million—far less than its $50 million in total debt—Sagaponack Partners LP, TestAmerica's New York-based majority shareholder, leveraged its contractual veto power over the sale to negotiate a side payment

of approximately $3.2 million directed to itself. *Id.* at 394, 401. Marc Weisman, Sagaponack's representative on TestAmerica's board, personally negotiated that arrangement on Sagaponack's behalf. *Id.* at 394. Mullins's company, Faraway Enterprises, received nothing. *Id.* at 401.

Neither Sagaponack nor Weisman had any traditional contacts with Texas. Sagaponack was a New York entity, Weisman was one of its limited partners, and there is no mention that they ever set foot in Texas. *Id.* at 395. The Fifth Circuit nonetheless affirmed specific jurisdiction over both of them, applying the *Calder* "effects" test. *Id.* at 402-03.

As to Sagaponack, the court found that it "was far from a passive transferee": "the very transfer underlying Faraway's claim was engineered by Sagaponack." *Id.* at 401. The court further found that Sagaponack was fully aware of the debt to Faraway and **"purposefully aimed its conduct at Faraway in Texas by ensuring that a portion of its own notes would be paid while knowing that Faraway's would not."** *Id.* at 402 (emphasis added). It was "therefore no 'mere fortuity' that Sagaponack's conduct would cause injury to Faraway in Texas." *Id.* The court concluded that "Sagaponack should reasonably have anticipated being haled into a Texas court for **precipitating and directing an alleged fraudulent transfer at the expense of a known, major creditor in Texas** whose right to payment arises out of contracts that share a strong connection with Texas." *Id.* (emphasis added).

As to Weisman, the Fifth Circuit held that specific jurisdiction was proper "for the same reasons" as Sagaponack. *Id.* at 402-03. "It was Weisman who represented Sagaponack on TestAmerica's board, had direct knowledge of the Note ... and ultimately obtained for Sagaponack the proceeds from TestAmerica's sale that underlie Faraway's fraudulent transfer claim." *Id.* at 403.

Defendants contend that Jacoboni's contacts with Texas were made solely in his capacity as a corporate officer. Spec. App., 8. That argument fails because, as Defendants acknowledge, the fiduciary shield doctrine does not protect tortious conduct. *Id.* at 8-9. The alleged conduct here isn't a breach of contract, but rather an intentional tort: the fraudulent transfer of NCS's assets to defeat a known Texas creditor's claim. *See Retamco,* 278 S.W.3d at 341 (noting that a fraudulent transfer under the TUFTA is a tort) (citing *In re Tex. Am. Express, Inc.,* 190 S.W.3d 720, 725 (Tex.App.-Dallas, no pet.)). That's why the court in *Mullins* found personal jurisdiction over Weisman. "Weisman's alleged conduct in engineering a transfer that knowingly impaired the rights of a Texas resident under agreements centered in Texas substantiates that he purposefully aimed his intentionally tortious conduct at the forum state." 564 F.3d at 403.

In *Sourcing Management, Inc. v. Simclar, Inc.,* 118 F. Supp. 3d 899 (N.D. Tex. 2015), a Texas corporation had obtained a judgment for over $3.75 million against Simclar, a Florida company. *Id.* at 903. Before the judgment was entered, Balmoral Funds—a California LLC with no office, employees, agents, property, or bank account in Texas—colluded with Simclar to acquire Simclar's assets through a private foreclosure sale code-named "Project Heat," designed to strip Simclar of its assets and render it unable to pay the Texas creditor. *Id.* at 905, 909. Balmoral argued it was simply a third party to a foreclosure and had taken no action purposefully directed at Texas. *Id.* at 909.

The court rejected that argument, holding that the plaintiff had made a prima facie showing that Simclar's assets were transferred "as part of a scheme to prevent Plaintiff, a Texas creditor, from collecting its Texas judgment." *Id.* at 910. Citing *Mullins*, the court confirmed that "intentional conduct designed to cause harm in the forum state is a basis for finding minimum

contacts," *id.* at 911, and that "involvement in a fraudulent transfer that targeted a specific entity in the forum state over a contract linked to the forum state could create personal jurisdiction over the individual." *Id.* at 911 n. 1.

Similarly, in *Dontos v. Vendomation NZ Ltd.,* 582 Fed.Appx. 338, 345–48 (5th Cir.2014), "the Fifth Circuit reversed the district court, and held that personal jurisdiction over out-of-state defendants was present where plaintiff alleged that defendants allegedly participated in a scheme to fraudulently transfer assets to prevent a Texas creditor/plaintiff from collecting a pre-exiting Texas judgment in violation of TUFTA." *Sourcing Management,* 118 F. Supp. at 911.

## IV.  FACTUAL ANALYSIS

### A.  Milner's Third Amended Petition establishes a prima facie case of personal jurisdiction over both NGT and Jacoboni.

Measured against *Mullins* and *Sourcing Management*, Milner's Third Amended Petition easily satisfies her prima facie burden.

#### i.  Jacoboni personally created and acknowledged the debt and assured Milner it would be paid.

In *Mullins*, the Fifth Circuit emphasized that "Sagaponack, through its insider status and conduct, clearly knew of TestAmerica's agreements with Faraway" and intended to avoid paying Faraway. 564 F.3d at 401. Here, Jacoboni's knowledge is even more direct.

Jacoboni himself recruited and hired Milner in 2020 to work remotely from her home in Wylie, Texas, specifically because of her experience in the call center industry. Third Amd. Pet., ¶ 10. As Vice President of Operations, Milner managed NCS's day-to-day operations—HR, hiring, training, IT, logistics, billing—entirely from her home in Collin County. *Id.* at ¶ 12.

Jacoboni personally agreed, on behalf of NCS, to pay Milner a salary of $5,000 per month.

*Id.* at ¶ 13. On April 15, 2021, after Milner quit over not being paid, Jacoboni personally acknowledged via email that NCS owed Milner $35,000 in unpaid salary and assured her that NCS would pay her once the company was profitable. *Id.* at ¶ 15.

In November 2021, Jacoboni personally asked Milner to return and assured her NCS was financially stronger because it had secured an investor. *Id.* at ¶ 16. Around 2021, Jacoboni formed two affiliated entities: NGT and NexGen Virtual Office, LLC ("NVO"). *Id.* at ¶ 18. NCS and NVO became wholly owned subsidiaries of NGT. *Id.* Jacoboni acted as the CEO of all three companies, and Milner acted as the VP of Operations for all three companies. *Id.*

In August 2024, Milner informed NCS that she intended to resign again because she still hadn't been paid. *Id.* ¶ at 23. Jacoboni personally asked Milner to stay through November 2024, and in return agreed to pay the $35,000 salary debt along with her final paycheck. *Id.*

### ii.  Jacoboni personally directed transfers to NGT and to himself instead of paying Milner.

In *Mullins*, Weisman engineered the fraudulent transfer on behalf of Sagaponack, a creditor of the transferor, TestAmerica. 564 F.3d at 401. This case is even stronger. Jacoboni was simultaneously CEO of both the transferor (NCS) and the intermediate transferee (NGT), and the ultimate individual recipient of the funds. Paragraph 33 of the Third Amended Petition alleges directly: "Joseph Jacoboni, as CEO of both NCS and NGT, personally directed the transfers of funds alleged here from NCS to NGT, and from NGT to himself, intentionally stripping NCS of assets to avoid paying Milner."

Milner alleges that, at Jacoboni's direction, NCS transferred hundreds of thousands of dollars to NGT after it had already incurred and acknowledged the debt to Milner, and NCS did not receive reasonably equivalent value in return. *Id.* at ¶¶ 25, 27, 33. Milner further alleges that,

within the last year preceding the filing of the Second Amended Petition naming NGT and Mr. Jacoboni as defendants, NCS transferred tens of thousands of dollars to NGT, and NGT transferred tens of thousands of dollars to Joseph Jacoboni, all without receiving a reasonably equivalent value in exchange. *Id.* at ¶ 26. On November 19, 2025, while this lawsuit was pending, NGT filed Articles of Dissolution with the Florida Department of State, identifying Jacoboni as the person appointed to wind up the company's activities and affairs. *Id.* at ¶ 32.

Milner's allegations are strikingly similar to those in *Mullins*, where Weisman "engineer[ed] a transfer that knowingly impaired the rights of a Texas resident," 564 F.3d at 403, then "took over as President in charge of winding up the company's affairs." *Id.* at 395. It's also the same pattern of asset-stripping and entity dissolution the court in *Sourcing Management* identified as "a scheme to prevent Plaintiff, a Texas creditor, from collecting," 118 F.Supp.3d at 910.

In *Mullins*, the Fifth Circuit found jurisdiction over Weisman even though he acted only as Sagaponack's agent and received none of the $3.2 million himself. *See id.* at 394 ("To date, Sagaponack has not made any distributions to Weisman . . . ."). Unlike Weisman, Jacoboni didn't act solely on behalf of a corporate principal. He is alleged to be the ultimate individual recipient of the fraudulently transferred funds—he directed the transfers from NCS to NGT and then to himself personally. Third Amd. Pet., ¶ 33. It's even clearer than in *Mullins* that the corporate shield doesn't protect Jacoboni.

### iii. Jacoboni and NGT intended to harm Milner.

Milner alleges that, in carrying out the fraudulent transfers, NGT and Jacoboni "intended to delay and hinder [her] from collecting her unpaid salary and to defraud her." *Id.* at ¶ 34. This

is precisely the "intentional conduct designed to cause harm in the forum state" that *Sourcing Management* identified as the hallmark of TUFTA-based jurisdiction. 118 F.Supp.3d at 911 (citing *Calder,* 465 U.S. at 787-90).

**B.       Defendants haven't negated the bases Milner asserts.**

Once Ms. Milner has made her prima facie showing of jurisdiction, the burden shifts to Defendants to "negate all bases of personal jurisdiction alleged by the plaintiff." *PetroSaudi,* 617 S.W.3d at 135. Defendants haven't done so.

Defendants' primary arguments—that any TUFTA violation occurred outside Texas and that they lack physical contacts with the state—are directly foreclosed by *Mullins, Sourcing Management,* and the other cases discussed above. In those cases, the defendants likewise had no presence in Texas and the alleged fraudulent transfers occurred in other states. Those facts didn't negate the plaintiffs' allegations of intentional fraudulent transfers harming Texas creditors. The same result follows here.

Finally, Defendants have not made, and cannot make, a "compelling case" that exercising jurisdiction over them would offend traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 477; *see Mullins,* 564 F.3d at 402 (finding no such "compelling case"); *Sourcing Management,* 118 F.Supp.3d at 912 (same). Texas has a strong interest in providing a remedy to its residents for intentional schemes designed to deprive them of wages earned in Texas. This is the appropriate forum.

## V. CONCLUSION

Milner has alleged sufficient facts in her Third Amended Petition to authorize personal jurisdiction over all Defendants. She respectfully requests that the Court deny Defendants' Special Appearance.

Respectfully submitted,

*/s/ Aaron Johnson*
Aaron Johnson
Texas State Bar No. 24056961
FAIR LABOR LAW
314 E. Highland Mall Blvd, Ste. 401
Austin, Texas 78752
Ph: (512) 277-3505
Fax: (512) 277-3254
ajohnson@fairlaborlaw.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2026, I filed the foregoing document via eFile Texas, which will serve a copy by email upon all counsel of record.

*/s/ Aaron Johnson*
Aaron Johnson
Attorney for Plaintiff